Good morning, Your Honors. My name is Ben Coleman. I represent Mr. Tuite. The issue in this case is whether a Sixth Amendment violation was harmless. How do you say the name? Tuite. Tuite? I believe it's Tu-it. Tu-it. Yes. Okay. The issue is whether a Sixth Amendment violation is harmless. And what I'd like to do is briefly start off with what the appropriate legal standard is, and then I'd like to talk about application of that standard. Well, the appropriate legal standard is Brett, no? I believe so. All right. So let's assume that. I mean, I don't understand the dispute, frankly, because it doesn't seem to be any point to doing it twice, since the Brex standard is more forgiving to the government, more favorable to the government than the Chapman, double Chapman, so you're just doing the same thing twice. Agreed 100 percent. So I'll just go right to application of the test. The second legal issue is I believe the State has somehow tried to contend that the Van Arsdall-Olden factors, those five factors, are not applicable here. They only apply on direct review. But this Court has clearly held repeatedly that those are the five factors that you consider, even under a Brecht analysis. Well, that's all fine, too. And let me tell you, to me this is a really hard case because it seems to be an extremely close case. Apparently the jury had a very hard time with it. But I am having a difficult time. And it would seem like almost anything would not be harmless. But this particular thing might have been harmless. So I want to know how this particular – the only thing you're complaining about, as I understand it, is the inability to cross-examine this expert with this letter he wrote. Nothing else. Is that right? That's what's been certified. Okay. And you haven't tried to argue anything else. The only question certified for review. Although you could have tried to argue a different question in the briefs, although non-certified, you didn't do it. So that's where we are. That's where we are. Tell me how this cross-examining this man with this letter would have made a difference. Okay. I understand. I also understand that the evidence that these experts gave, although maybe counterintuitively, was given a fair amount of emphasis in the closing arguments, for example. Yes. But how does this letter impeach this guy in any way that would have mattered, as opposed to being more likely to backfire? Well, first of all, I believe under the legal standard, the court has to assume that there would have been full impeachment effect. The court can't assume, I think that's in cases like Slavic, that you have to assume that the full impeachment effect of the letter would have been realized. I think the letter is very probative of bias. I mean, this is a But the letter also suggests exactly the sort of thing that you never want to come in as a defendant, which is that this expert had some reason to think that this was really the killer, and that, I mean, it would have suggested to the jury that there was even more information than they were getting and that this very prominent man really believed it. Why is that bad? It's not 100 percent clear to me that that portion of the letter would have been used. I mean, I think the defense could have had the ability to select the portions of the letter. Well, but we pretty much know you can't let in just the part that you want. You know, once the door goes open, if you're, you know, you can't just pick the part of the letter that you want and then not let the other side rehabilitate with what else is or go into what else. I mean, that's pretty standard trial work 101. I mean, I've been there. Oh, I've been there, too, and I don't necessarily know I agree. I mean, this court has held repeatedly there is no rule of evidence called open the door. I mean, this would be impeachment evidence, unless some of the other comments in the letter would have somehow rehabilitated the witness, and I don't see how his belief that Richard Thewitt was the expert. Well, but generally you're not allowed to take things out of context. People are allowed to, you know, I mean, I think eventually that, you know, they would be, you know, if you're going to let it come in, I'm not sure that I wouldn't have let it come in had I been the trial judge, and so from that standpoint, you know, I think it probably would have been better to let it come in, but I also would have let people explore it in its entirety, and so I think what Judge Bergeron is saying, you know, these people obviously had some sort of professional squabble here, and it would appear that the expert that you called, it was O'Toole, I guess, right? Was it O'Toole? That she was originally retained by the prosecutor's office when they were of the theory that the boys did it, right? I'm not quite sure the word retained is applicable. She was with the FBI. They called the FBI in. Well, right, but anyway, so there are these people, these are these experts out there that seem to have, you know, I see what you're saying about bias, that the rebuttal expert that they called seemed to think that the expert that you called was, you know, someone that they shouldn't use because she's trying to let the, you know, she's somehow. But it wasn't just that, and this is really the powerful impact of the letter. The government's, you know, the prosecution's expert lied about what the state believed O'Toole was doing. The government's expert stated that O'Toole, that the attorney general's office and the sheriff's office felt that she was obstructing justice and committing perjury or something to that effect. I think it was obstructing justice was the language used. And people at the attorney general's office and the sheriff's office said, we never said anything like that or even had spoken to McCrary. So this is an expert who is basically, it would be like what he's doing, he's writing a letter to this, I guess, council that governs all these experts. It would be like somebody writing a letter about a judge to the administrative office of the U.S. courts or the judicial council or something, trying to get them to silence this particular witness and making false accusations and allegations about what, about her testimony in the case. I mean, that is powerful impeachment evidence. That's why the prosecution fought so hard to exclude the letter. And that's why in the prosecution's rebuttal closing argument, they actually tried to twist the tables and make an argument that it was really courageous for McCrary, their witness to testify, because he was risking the scorn and the wrath of all the FBI colleagues because he was going against an FBI agent. When exactly what was really going on was that McCrary, it was courageous for O'Toole to testify for the defense because it was McCrary who was trying to silence her by going to all their colleagues and making false accusations about her and her testimony. All right. But the gist of their testimony was whether it was an organized or a disorganized crime, right? I disagree with that. Well, I guess tell me otherwise because I wondered on some level, you know, experts are supposed to be helpful and the jury got to see what the crime scene was. The jury got all of the, you know, the circumstances about that and the experts both won opine by, well, more people could have done it or it was organized, it was disorganized or whatever. But sort of the elephant in the room seemed to be that ultimately the victim's blood was found on your client's shirt. So that's, you know, and that's what the state court focused on. Hey, this guy was at the scene, so. How did it limit your third-party defense, I guess? I guess I have three answers to this question. Okay. Okay. The first answer is I think we need to look at this more as trial lawyers because then when you're conducting a harmless error analysis, you need to look at really how the trial would have played out. And O'Toole was a big problem for the prosecution and it was a defense attorney's dream. You had an FBI agent with 23 years of experience who's analyzed over 5,000 homicide scenes who's going to come into court and say that the crime scene supports the defense's theory of the case. That the murder was organized, planned, committed by somebody who was familiar with the scene and most likely by multiple assailants. Directly what the prosecution, I mean the defense's theory of the case. Okay. And you got to put her on, so there's no doubt about it. It was a big problem for the prosecution. So this is a, and the other thing that was interesting about O'Toole is that the prosecution's theory of the case was that the Escondido Police Department had really kind of just screwed it up in this case. And there was kind of like a conspiracy to cover up their mistakes and they weren't admitting to all the things they did wrong. Well, O'Toole was from the FBI. She wasn't from the Escondido Police. She was a fed who had nothing to do with the Escondido Police and her getting on the witness stand with her 23 years of experience and her 5,000 homicides was very impressive for the defense. Earlier today, the government was claiming that, you know, we defer to law enforcement officers' observations in their training and experience. Well, remind me on her cross-examination, how did she deal with the victim's blood was found on your client's shirt? Did they? I don't think that that was really a major source of the cross-examination. I can't recall. That isn't what she was testifying about. Right. She was testifying about the crime scene. And obviously the defense had their own version of why this minute little bit of blood wound up on Mr. Tewitt's shirt, which is very inconsistent with Mr. Tewitt. And we know that the jury came back hung at one point. They came back hung. On the blood evidence. They specifically said their note to the jury was, we have been debating this blood evidence and we can't come to agreement, and then they went on to say we think we're hopelessly deadlocked. And then he sent them back. So for all we know, they never got anywhere on the blood evidence, and they ended up relying on something else. Correct. And they specifically sent a note to the judge saying that can the crime scene, a lack of evidence at the crime scene or the crime scene not fitting the theory of Tewitt, can that be a basis for reasonable doubt? They sent a specific jury note on that to the judge. And the judge responded, well, it can and it can't. So they were considering this. This wasn't just sort of this, I mean, the California Court of Appeal, I think they really diminished the importance of this testimony. And the testimony also, as to its importance, it interlocked with the blood evidence. Because O'Toole's testimony that there were, in her mind, that there were likely multiple assailants corresponded with the expert testimony of Brian Kennedy for the defense. And his testimony was based on the blood, was significant to the blood evidence and also to the comforter in the crime scene. And let me explain this. There's a statement in the letter that she was not allowed to testify in the civil case. I don't know what that means and how it would have affected the impact of this letter. Do you want to eliminate that? You know, I'm sorry, I can't. I don't know whether she was or wasn't allowed to testify. But there was a civil case. There was a civil case. The civil case I believe that's being referred to is that the three teenagers sued, you know, all the various law enforcement officials that were involved in the case. And were being charged with murder and coercing confessions or whatever. Things like that. I think Judge Rhodes had actually originally granted immunity or some type of qualified immunity and dismissed the case. I think it was appealed to this Court and somewhat fairly recently I think the Court may have sent it back. But that was the civil case that I think he was referring to. It was a Federal 1983 case. What was the response of the trial judge to the jury's question? You did that very horribly. They sent a question and what was the response? I'm sorry that I wasn't clear. I will read you the exact language when I go back and look at the excerpt. But in essence it was it can or cannot create a reasonable doubt. That's for you to decide. That was essentially what he instructed the jury. What cannot create a reasonable doubt? I'm sorry. The question that the jury had sent to the judge was can a lack of evidence at the crime scene with respect to Mr. Tewitt be a basis for reasonable doubt? That was the question that they asked the judge. And the judge said it may or may not create reasonable doubt. That's for you to decide. Okay. Thank you very much. We'll give you a minute and a half or so in rebuttal. And we'll give you two and a half extra minutes because he just had two and a half extra minutes. May it please the Court. I will address Lynn McGinnis, Deputy Attorney General, for the people of the State of California. The Court had asked. You're what? You're Lynn McGinnis? Lynn McGinnis. Okay. The people are concerned that the Court seems ready to overrule Intivong. The Court had expressed concern that it didn't understand the two-part test, that the people were still urging for harmless error. And I want to discuss that for a minute because. What possible difference could it make? The possible difference it could make is being, in this case, none, because it's the people's position as pointed out by the Court, and I will discuss the letter in a minute, that this error or purported error is harmless even under the Chapman standard. But look what we're doing here. If you look at ‑‑ if you use the objectively unreasonable standard of Intivong, what you would do is you would look at the court of appeals analysis under the Chapman standard, and you would say that is a reasonable application of Chapman. They looked at the five Van Arsdale factors that you used to analyze a harmless error. They might have placed more weight on one factor than this Court would have placed on that factor. And so you think you never get to Brecht, then? Then you never get to Brecht. And that's what the rule is versus what ‑‑ And aren't you better off with Brecht almost always? Your Honor, not necessarily. And the reason is, in a case like this, this is what's happening here. In a majority of cases, you might be. But let's take a case like this. Let's say that this wasn't this. First of all, didn't the Supreme Court essentially explicitly hold that you don't ‑‑ that Brecht is what governs? I mean, that is the circumstance in which Brecht arose to begin with. It's where a State was applying Chapman. And it's been reinforced after AEDPA, and it just seems like a nonissue to me. Well, Your Honor, you know, I don't want to bypass the harmless error issue, but it does not seem like a nonissue to the people, because what happens here is that you're totally getting rid of the AEDPA deference. You're no longer looking at the court of appeal decision. And look what defense counsel is doing here. He's saying, here are the five Van Arsdale factors. But you'd have to have a circumstance in which ‑‑ you'd have to imagine a circumstance in which the State properly applied Chapman but would lose under Brecht. I mean, or reasonably applied Chapman but would lose under Brecht. That seems impossible. Your Honor, it probably is. But the problem is ‑‑ And why are we worrying about it? We're worrying about it because look what's happening in a case like this. Counsel is basically taking what amounts to a fifth bite of the apple and asking this Court to apply the Van Arsdale factors, totally disregarding what the court of appeal says. No, but he can only ask us to apply them with Brecht deference, which is more deference than you're going to get under an AEDPA-Chapman approach. So I really don't understand why it's ever going to not be in your favor to do it this way. Your Honor, the people won't spend a lot of time on it, but ‑‑ They already have. But the AEDPA-Chapman standard is more deference to the court of appeal because it simply looks at what the court of appeal does. And if that decision is reasonable ‑‑ Why don't you go to the characterization of the crime scene as organized or disorganized. And from your perspectives, tell us why that is or is not important to the prosecution's case. Well, the characterization of the crime scene as organized or disorganized made absolutely no difference to the prosecution's case. First of all ‑‑ If it didn't make any difference, why did they bother putting this person on and why did they spend many, many pages in the closing argument? That doesn't seem to me to be our strongest argument. It seems to be at least of some relevance. And the blood evidence was obviously troubling the jury and troublesome. Well, the blood evidence was troubling the jury, and that's what the jury focused on in the note. But the crime scene ‑‑ We don't know that in the end. I mean, it's perfectly possible, maybe even probable, that they couldn't get any place on the blood evidence, which is really ‑‑ I mean, unlike most DNA blood arguments, this one seemed like a pretty responsible one on the part of the defendant. I don't know if it's right or wrong, but it certainly wasn't crazy. And it's perfectly possible that the way they finally got over their being hung was by going to something else. But, Your Honor, that's speculation and ‑‑ Of course it's speculation. Harmless error is always speculation. Harmless error is somewhat speculation, but you have to look at what the jury did. And it had some importance at the time of the trial, but under Brecht, you have to look at the whole circumstances of the trial and what the jury actually focused on in their questioning. I would prefer that you address the question of whether this cross-examination specifically would have made a difference. As to even assuming that the ‑‑ that the organized, disorganized evidence could have been of some importance. Okay. When you look at the letter, and as this Court pointed out, most of this letter, I mean, it was characterized by defense as an effort to discourage the witness from testifying. That's actually not what it is. And when I read the letter over, and I read it over several times, I mean, with all respect to the court of appeal, we didn't argue that this letter didn't show bias. But, really, this isn't even a question of bias in this letter. What this letter actually talks about is that the expert reviewed the evidence, and based on the evidence that the expert gathered, and based on conversations with other people, this actually was the basis of the expert's opinion. I have trouble seeing any bias in this letter from the classic form of bias. For example, if a witness is a family member of a victim and that's not disclosed, or if a witness has a pecuniary interest in a case and that's not disclosed, if you look at the letter, it talks about, based on the blood evidence on the T-shirt and based on the investigation that was done subsequent to what the police did, the evidence points to one man, Mr. Tewitt. So that's basically talking about the evidence in the case. So this letter really doesn't go to the question of bias. Well, couldn't you argue that it was written in a way that it was trying to discredit this person so that she wouldn't be used by the law enforcement community in the future on cases? Like sort of going after the person's career credentials, that because this person had the audacity to take a different view than he had of the case, that I'm going to ruin this person professionally? Well, he didn't say he was going to ruin the person. Who was he complaining to, though? People that would use her? People that would use her. But when he testified at the in limine hearing, and all this would have come out if the letter had been introduced into evidence, because, again, you don't, as the Court pointed out, when defense counsel argued you don't introduce these things in a vacuum. When he wrote the letter, he was asked by the president of the organization to write the letter. He didn't just write a letter because he felt like writing a letter and he wanted to dissuade the witness from testifying. All that would have come out in the cross-examination, and you have to look at were the cross-examination fully realized. You can't just take the letter in a vacuum. What about the fact that he seems to have made, at least vastly exaggerated, the actual reaction by the San Diego County Sheriff's Office and Attorney General by saying that he was, they thought that she was obstructing justice and so on. That was a criminal charge, wasn't it? She's obstructing justice. That was a criminal charge. Right? That was a criminal charge against the other agent. She's obstructing justice. Not really a criminal charge, Your Honor. Why not? Why not? Isn't it a criminal charge to obstruct justice? Well, I'm not sure that's what he meant, Your Honor. No, but isn't that one way you could read it? She's obstructing justice. That might be one way you could read it. And that's one way the jury might have read it. That's one way the jury might have read it, but you have to ask would that one part in the letter, which is arguably the only part that was a little bit off, have made a difference to the outcome of this trial? Now, what you also have to do is ask. I'd like to go into that because I haven't had much chance to ask questions in this case, but as you say, the key is the blood evidence. And the blood evidence, as I see it, was very disputed. And I want to read over what seemed to me the facts. On April 28, 1998, the police get to its close, and there was no blood found on the red shirt. None. That's the initial investigation. The white shirt finds blood stains. And then on May 18, the white T-shirt is tested, and the tester found the blood stains matched to its generic type. Well, that's his shirt. Stephanie was excluded as a donor of DNA. So that's the initial testing, which you might think was controlling. Then on December 1998, there's another test of the red shirt for DNA, and the tester finds Stephanie's blood on the red shirt. And then more testing finds Stephanie's blood, Stephanie's DNA, and the DNA of a male on the red shirt. So, I mean, certainly if you go on testing, the evidence gets very bad for doing it. But certainly, I would think there was quite a lot of doubt. Was it there originally? Do you want to comment on that? Well, Your Honor, as I understand it, not all portions of the shirt were tested originally. The hem of the shirt was not tested originally. And obviously, it was the prosecution's theory that the police department focused on the wrong suspects and didn't do a thorough job of testing. That's undisputed. It was the defense's job that there was some kind of contamination. And that's why the jury was focused on the blood evidence in this case. Now, the idea with this letter that it was somehow spilled over into the or these experts somehow spilled over into the blood evidence, I just don't see that. The blood, the experts didn't testify about the blood evidence. Well, they did testify about the blood. The jury must have been divided, as I am when I read this. You know, we've got no reason not to believe the State's case. But as you read it, you're left in real doubt. Who did it? And that's not the question before us, but I say that as a comment on the evidence. There is a real question in my mind. Who did it? I don't know, after I read your whole brief. Your Honor, with all due respect, it looked like that in the news, and it might have looked like that from the court of appeal opinion. But when you read the record and you listen to the, quote, confessions of these young teenagers, and you look at what Mr. Tewitt was doing on the night in question, and the fact that he was heading up the driveway toward that house, and he had a knife, and he was right there at the time. I didn't know he had a knife. I thought he'd had knives a thousand times. He'd had knives in the past, but he was heading right that way, and they actually found him. Was that the only road to that house? That was the only road. It was that road only to that house, I guess is my question. Yes, Your Honor. There are unexplained mysteries, such as the door being locked. Who locked the door after he'd gone out? Well, Mr. Tewitt locked the door. Well, no one knows who locked the door. How did he lock the door? We know the door was locked, and the jury made a determination based on the evidence that they had. That may be the prosecution's theory. But I would like to ask a question if Judge Noonan is done. I would like to hear what is your best argument that the error is harmless? Our best argument that the error is harmless, it's twofold. First of all, as the Court pointed out, the entirety of the letter would have come in, and some of it looks awfully bad for the defense. Now, there was never a request at trial that the letter should come in and have part of it redacted. The request was that the whole letter would have come in, and that would have included Well, what he wanted to do was cross-examine the letter. So I assume what would have happened was they would have stood up there and said, didn't you write this and didn't you write that? And the only way the whole letter would have come in would have been if the prosecution asked for the whole letter to come in. Yes, Your Honor. And the entirety, we have to assume the entirety of the circumstances surrounding the letter would have come in. The second and strongest argument is I can't think of anything more collaterally collateral to this case as to the issue of whether the crime scene was organized or disorganized. That says absolutely nothing about the identity of the killer. The all of the evidence, as the court of appeal pointed out, all of the evidence was before the jury as to whether the how the crime scene was Well, it certainly appeared from the evidence of both of these people that they had spent a great deal of time and energy in their professional lives thinking otherwise or proving otherwise. I mean, they had Mr. McCrary first, and I guess he was her teacher, had developed a very elaborate set of protocols for which they regarded as professionally significant and not accessible to lay people for determining what the crime scene itself could tell you about the likely identity of the perpetrator. That's true, Your Honor, but whether the crime scene is organized or disorganized Well, that's a phrase. But they had specific testimony about why this made it more likely that it was these people than those people. Or not these people. More likely that it was essentially an insider than an outsider or a person who planned rather than somebody who just came upon. It wasn't the ultimate phrase was insider, organized or disorganized, but it had components and it supposedly had significance in determining which of the two possible sets of perpetrators here were the right ones. But the strongest evidence, Your Honor, against Mr. Tewitt was the fact that he went up to the house, to these houses at the time of the crime and that his blood was found on the shirts that Mr. Tewitt was wearing. I'm sorry. It had nothing to do with these experts dueling opinion on whether the crime scene was organized. Thank you very much. You've gone way over your time. Well, that's the strongest evidence, that he was heading that way. That's not very much evidence. I didn't get your answer to my peripheral question, but it is part of the mystery. Who locked the cellar door? The prosecution's theory was that Mr. Tewitt locked it after he left. But I thought it was locked from the inside. He was outside. I don't get that. I couldn't believe that was your answer. He locked it from the inside after he got outside? Is that the answer? He got outside, and then he locked it on the inside. That doesn't make sense to me. Your Honor, that's, you know, honestly, I don't remember. That's what I thought was the prosecution's theory. The evidence was that it was locked from the inside, and that was one of the things that came out in the site survey expert evidence. Okay. Thank you very much. You know, sometimes, again, as you've made a decent case for your call to prosecution, but, you know, sometimes there are real mysteries. And to me, this is a real mystery. The police, perhaps through their bondage, have created a real mystery. Thank you, Your Honor. So we'll give you about three minutes, because she was trying to equalize this. Go ahead. Thank you very much. A couple of quick responses to Judge Noonan's inquiry. Your Honor is absolutely correct. The door was deadbolted from the inside, and the prosecution's theory of how Mr. Tewitt left the house, they weren't very clear. But their best shot was that he went out the sliding glass door of the parent's bedroom, and the sliding glass door was one of these creaky ones that would have made an incredible amount of noise. So that was their theory as to how he got out of the house, which made very little sense. The door was locked from the inside. But that door was the laundry room door, right? Yes. He had locked that door. Is there a front door in his house? That was what they used as the front door. That was in the evidence. So as you say, it was a total mystery. Also with respect to Judge Noonan's question about the juror's note, it's found on pages 176 to 177 of the excerpts of record. The note is as follows, quote, may lack of physical evidence of defendant at the crime scene, parentheses Crow House, be a determining factor in creating reasonable doubt, end quote. And the judge's response is, quote, it may or may not be determinations of this kind are for you to decide, end quote. Well, but the lack of physical evidence, what they were talking about in the trial, it was correct, my understanding is they didn't find any DNA evidence of your client at the scene. Correct. The DNA evidence was on the shirt down here of Stephanie. But that wasn't, they looked at the scene and there was, so I don't see how that has anything to do with, I mean, that was to your advantage. Well, obviously. And obviously, but they resolved it against you. I mean, I think we have to stay back on, it's all about not being able to cross-examine this witness on this letter, why that was injurious. Well, the reason why this comes up is because the California Court of Appeals and the prosecution here is claiming, well, the whole case was about the blood evidence, that was it. And our point is, well, that's their theory of the case, but the defense's theory is that the crime scene did not, there was no explanation for how Mr. Tewitt could have done this based on the crime scene. And they presented this expert who was a crime scene analysis expert with 25 years of experience in the FBI to corroborate their theory of the defense, and then the prosecution calls a rebuttal witness to that crime scene expert. Okay, but you were allowed to put evidence in that there was no physical evidence from your client at the scene. Correct. But they did have all the, you know, so it's just really about this one letter, how if you had been able to cross-examine on this one letter, how that would have changed the whole calculus. Correct. Whether it was harmless, and in a case like this, which is incredibly close, where we're all sitting here saying it's a mystery, it's a whodunit. Well, I didn't say it was a mystery, so not everyone, you know, if you're going to quote, be accurate. Only one judge has said it's a mystery. I agree with that, that it's not harmless. And one thing I'd also say is we've, this is quoted from the United States Supreme Court in United States v. Aggers. They've said, if a verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt. So even if you want to say that this letter is of relatively minor importance and we don't believe that it is, but even if you want to assume that, given the closeness of the case, it's given the questionable validity of the verdict. They were hung, and then they reach a compromise. It would be helpful to me as your parting statement if you could give me a one or two-sentence, succinct version of why this letter. I am totally accepting the premise, as I said at the very outset, that just about anything could have mattered in this case. Why did this matter? The best reason why the letter mattered is because McCrary lied about O'Toole in the letter and what her testimony was. He flat-out lied. Her testimony, what it was, or what these people thought of her, or both? Both. He, well, I guess more about what the people thought of her, but I think it's related to her testimony. He says that both agencies, referring to the Attorney General and the Sheriff's Department, are shocked and dismayed that Mary Ellen O'Toole, a representative of both the FBI and the ICIAF, has injected herself into this case and what they view as an attempt to obstruct justice and undermine the successful prosecution. So you're visualizing a cross-examination that went something like, did you say that? Yes, I did. Did they, in fact, what is your reference to they had this view? And maybe putting on somebody to say that we didn't have that view and showing that he was lying about that. And McCrary flat-out admitted he had never even spoken to the Attorney General's office or the Sheriff's. Admitted that where, in the voir dire? Yeah, in the ex parte, outside the presence of the jury hearing, that he had never even spoken. They had never even spoken to him. So he would have brought that out that he had never spoken to them and he was saying something that he had no basis for. Right. It wasn't just that he was sort of slightly twisting or exaggerating a little bit what they said. He never spoke to them, period. He's just making this up. Okay. Thank you very much. Thank both of you for Mr. Coleman, I'd like to congratulate you on your argument. Are you appointed counsel? I'm appointed counsel, yes, Your Honor. Thank you very much. Thank you very much. The case of Twitt v. Martell is submitted. We will take a short break. Thank you. All rise.
judges: Noonan, Berzon, Callahan